IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HALL ARTS CENTER OFFICE, LLC, | § § § | |
| Plaintiff, | § § | |
| VS. | § § | Civil Action No. 3:16-CV-3226-D |
| HANOVER INSURANCE COMPANY, | § § | *This memorandum opinion and order was originally filed under seal on August 6, 2018.  It is being filed unsealed on September 4, 2018 with requested redactions. |
| Defendant. | § § | |

MEMORANDUM OPINION
AND ORDER

In this removed action seeking recovery for a claim for lost rental income and soft costs under a builder's risk insurance policy, defendant Hanover Insurance Company ("Hanover") moves for summary judgment on all claims.  Plaintiff Hall Arts Center Office, LLC ("Hall Arts"), a company engaged primarily in the business of commercial real estate, cross-moves for summary judgment.  Hanover and Hall Arts both move to exclude expert witness testimony.  For the reasons that follow, the court grants in part and denies in part Hanover's motion for summary judgment, denies Hall Arts's cross-motion for summary judgment, and denies Hanover's and Hall Arts's motions to exclude expert testimony.

I

This lawsuit arises from a dispute over Policy No. IHD-9935566, a builder's risk insurance policy (the "Policy"), issued to Hall Arts.[1]  The Policy covers the construction of

---

[1]Because both sides move for summary judgment, the court will recount the evidence that is undisputed, and, when it is necessary to set out evidence that is contested, will do so

an 18-story office building and adjoining retail space at 2323 Ross Avenue in Dallas (the "KPMG Plaza"). Hall Arts owns KPMG Plaza.

Turner Construction ("Turner") was the general contractor for the KPMG Plaza construction. The contract between Hall Arts and Turner set two progress milestones for the project: (1) a topping-out and dry-in date[2] of November 1, 2014, and (2) a substantial completion date[3] of April 1, 2015. Turner commenced construction on August 1, 2013. Over one year later, on October 13, 2014 rainwater leaked through openings in the temporary roof and damaged one of the high-voltage bus ducts ("Bus Duct B") (the "Weather Event"). Bus Duct B was intended to deliver electricity to mechanical equipment on various floors of the property. Bus Duct B was repaired and energized by November 25, 2014.

The relevant tenant of KPMG Plaza in this case is KPMG. KPMG's lease provides that it will lease about 150,000 square feet of the building, spanning from the third through seventh floors to part of the eighth floor. KPMG was originally scheduled to commence its

---

favorably to the side who is the summary judgment nonmovant in the context of that evidence. *See, e.g., GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 718 n.4 (N.D. Tex. 2010) (Fitzwater, C.J.) (quoting *AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5, 2007) (Fitzwater, J.)).

[2]Completion of topping-out work is the "installation of sufficient measures to complete placement of the concrete at the deck above the 18th level." D. 3/30/18 App. 80. Completion of dry-in work is the "installation of sufficient measures to allow tenant finish work to begin on the 14th level[.]" *Id.*

[3]Substantial completion is the date when, "[i]n general, the only remaining Work shall be minor in nature so that the Owner could occupy the Work, it can be accepted as final by Owner within thirty (30) days following the date of Substantial Completion, and the completion of the remaining Work by Contractor would not materially interfere with or hamper the Owner's normal use of the Work." D. 3/30/18 App. 80.

tenant fit-out, or the process of preparing the interior space for KPMG's occupancy,[4] on December 22, 2014, and, prior to the Weather Event, voluntarily delayed its tenant fit-out to January 1, 2015. KPMG did not actually commence the tenant fit-out process until January 14, 2015. On January 20, 2015 the Dallas Fire-Rescue Department ("DFRD") halted the fit-out, requiring Hall Arts to complete certain fire alarm and life safety items before resuming.[5] DFRD, Hall Arts, and Turner agreed to a revised list of required items on January 30, 2015. KPMG commenced its actual occupancy of KPMG Plaza, and paying rent to Hall Arts, on July 27, 2015.

Section 3.1 of the KPMG lease specifies when KPMG is to begin paying rent:

> Rent will accrue beginning on the date ('Commencement Date') which is the earlier to occur of: (i) the commencement of occupancy of the Premises by Tenant for the normal conduct of business; or (ii) the date that is nine (9) months following ['Construction Move-In Period'] the Delivery Date (but in no event prior to (1) Substantial Completion . . . of Landlord's Premises Work . . ., (2) Substantial Completion of Landlord's Building Work. . ., and (3) receipt of Certificates of Occupancy for the Core and Shell with respect to the Premises[.]

D. 3/30/18 App. 232. The lease requires the landlord to deliver the premises to the tenant with each floor of the premises dried in and sufficiently complete to allow the tenant to commence tenant's work (the "delivery date") by October 1, 2014. *Id.* at 234. The lease also

---

[4]Neither party defines what the process of "tenant fit-out" involves in this case.

[5]DFRD required (1) a fully functioning monitored fire alarm panel, (2) garage fire alarm operational, (3) life safety systems operational (including elevator recall), (4) emergency electrical functioning, and (5) generator tested and furnishing.

states that the "Landlord shall Substantially Complete the Landlord's Building Work by June 30, 2015." *Id.* ███████████████████████████████████████████████ ██████████████████ *Id.* at 228.

Hall Arts sought compensation from Hanover under the Policy for costs arising from alleged delays resulting from the Weather Event. Pertinent to the dispute in this lawsuit, the Policy provides for coverage of "soft costs incurred during the delay period" so long as they "arise out of a 'delay' to a 'building or structure' at a 'jobsite' described on the Delay in Completion Schedule." P. 3/30/18 App. 50. "Soft costs" are defined as "the necessary and reasonable costs relating to the construction, erection, or fabrication of a covered 'building or structure' that are over and above those costs that would have been incurred had there been no 'delay period.'" *Id.* at 51. The Policy specifies that soft costs are limited to interest payments, realty taxes, lease expenses, and insurance premiums. Covered insurance premiums are the "[a]dditional cost of insurance premiums necessary to renew or extend insurance coverage." *Id.*

The Policy also covers "actual loss of rental income incurred during the 'delay period'" that "arises out of a 'delay' to a 'building or structure' at a 'jobsite' described on the Delay in Completion Schedule." *Id.* The Policy defines "delay period" as "the period of time the completion of the construction, erection, or fabrication of a covered 'building or structure' is 'delayed' as a result of direct physical loss or damage caused by a covered peril to property covered under the Builders' Risk Coverage form to which this coverage part is attached." *Id.* at 49. "Delay" is "an interruption in the construction, erection, or fabrication

- 4 -

of a 'building or structure' caused by a covered peril." *Id.* "Buildings or Structures" are defined as: "a. buildings; b. structures; c. materials and supplies that will become a permanent part of the buildings or the structures; and d. foundations, excavations, grading, filling, attachments, permanent fencing, and other permanent fixtures." *Id.* at 44. The "Perils Covered" provision states that risks of direct physical loss or damage are covered unless the loss is limited or caused by an excluded peril, which includes, *inter alia*, seizure by civil authority, earth movement, fungus, nuclear hazard, flood, sewage backup, war, and *delay in completion and increased construction costs*. *Id.* at 34-37. The Policy states that "[i]f a waiting period is indicated on the Delay in Completion Schedule, we do not pay for: a. additional soft costs; b. loss of rental income; or c. loss of net income until after the number of days indicated on the schedule have passed." *Id.* at 56. The Delay in Completion Schedule specifies that the waiting period is 30 days. *Id.* at 58.

The Delay in Completion Schedule lists the jobsite as

> NEW CONSTRUCTION OF 18 STORY OFFICE BUILDING ON TOP OF EXISTING PARKING GARAGE AND 2 STORY FREE STANDING RESTAURANT BUILDING; 470,386 SQ FT AND 20,947 SQ FT; CONCRETE FLOORS, METAL STUDS, GLASS EXTERIOR WALLS FOR LARGER BUILDING, TILT WALL CONCRETE WITH METAL DECK ROOF FOR THE RESTAURANT.

*Id.* at 64.[6]

To secure coverage, a builder covered under the Policy "must produce records,

---

[6]The Delay in Completion schedule refers to form IM7851 for the project description.

including tax returns and bank microfilms of all canceled checks relating to value, loss, and expense and permit copies and extracts to be made of them as often as [Hanover] reasonably request[s]." *Id.* at 39. The Policy provides that

> [i]in determining an Income Coverage loss, [Hanover] consider[s]: 1. the probable experience during the time of "delay" had no loss occurred; 2. continuing operating expenses normally incurred by the "business", including, but not limited to, payroll expense necessary to resume "business" to a similar level that existed before the occurrence of direct physical loss or damage; and 3. pertinent sources of information and reports including: a. accounting procedures and financial records; b. bills, invoices, and other vouchers; c. contracts, deeds, and liens; d. reports on feasibility and status; and e. records documenting the budget and marketing objectives and results.

*Id.* at 56. The Policy also requires Hall Arts to "cooperate with [Hanover] in performing all acts required by this policy." *Id.* at 39.

On April 2, 2015 Hall Arts submitted a claim to cover the cost of repairing Bus Duct B ("hard costs claim"). Hanover and Turner met on June 11, 2015 to "finalize the builder's risk claim." During the meeting, Turner mentioned the possibility that Hall Arts could have a delay claim for soft costs and loss of rental income stemming from the Weather Event.

Hall Arts submitted a second claim for soft costs and loss of rental income on November 10, 2015. Hall Arts attached an interim expert report by Navigant Consulting, Inc. ("Navigant Consulting"), which calculated Hall Arts's damages. The claim included lost rental income from tenants, including KPMG and other tenants, as well as soft costs, including interest on construction loans and realty taxes. At that time, Turner estimated that the Weather Event resulted in 54 days of lost rental income from KPMG.

Hanover acknowledged receipt of the claim on November 16, 2015, and, on December 3, 2015 emailed Hall Arts stating that no determination could be made at the time and that Hall Arts would be informed if further documentation was needed. Two weeks later, Hanover requested additional documentation, including the original schedules for June, July, October, November, and December 2014, along with the biweekly schedule meeting minutes for July, September, and October 2014.

On December 30, 2015 Hall Arts sent Hanover the construction schedules for June, July, August, and December 2014, and meeting minutes for the months of July, September, and October 2014. Hanover wrote back on January 15, 2016 that the supplied information was insufficient to permit Hanover to review the claim.[7]

On March 7, 2016 Hall Arts responded with additional information, including an

---

[7]Hanover stated:

> The information supplied is incomplete. Per previous request, the original schedules for the months of September, October, November, and December 2014 have not been received. The claims for "loss of business income" cannot be properly evaluated due to incomplete information. We request you send us copies of the original schedules for September, October, November and December along with the schedule you sent us along with the schedule minutes from [November and December]. The December schedule you sent us was a revised schedule. We need the original to compare. Without the schedules during and immediately after the loss date, we cannot accurately evaluate your delay claim and we can't see how anyone else could either.

P. 3/30/18 App. 77.

October schedule update that was conducted in November 2014. Hall Arts also proposed a meeting between the parties and consultants to finalize the claim. Hanover stated that it would review the materials and advise on the next course of action. On March 30, 2016 Hall Arts sent a follow up email, again suggesting a meeting between the parties and their consultants. Hanover responded that it would deliver a report soon and would discuss a meeting later, if warranted. The report, produced by Hanover's consultant, Michael S. Eddings of PT&C LWG Forensic Consulting Services, concluded:

> The Loss of Business Income Claim for this project could not be accurately evaluated because of the lack of information supporting the claim. To properly evaluate the claim, original construction schedules for the months of August 2014 through December 2014 were needed. Original Master Construction Schedules for June, July, and August of 2014 were received. Schedule Updates for November 2014 and Revised Master Construction Schedule for December 2014 were received, Request for the missing Original Master Construction Schedules for the months of September, October, and November, and December of 2014 were requested via e-mail on February 10, 2016 (Attachment E, E-mail request prepared by Eric Clontz). The requested Original Master Construction Schedules were not received and therefore, the Loss of Business Income Claim cannot be accurately evaluated.

*Id.* at 174. Hall Arts's insurance coverage counsel wrote back via email that Hall Arts had given substantial information to Hanover, which should have allowed Hanover to investigate how the Weather Event impacted the construction schedule. Hall Arts again proposed an in-person meeting to resolve issues regarding the soft loss claim. A different consultant to Hanover, Constantine "Gus" Cois ("Cois"), a Senior Project Manager for DBI Construction Consultants, LLC ("DBI"), sent notice to Hall Arts of various inconsistencies in Hall Arts's

-

documentation. The notice also requested further documentation and stated that a supplemental request might be necessary. Hanover requested, *inter alia*, meeting minutes that Hall Arts had not yet provided and all updated schedules from October 2014 through project completion. Hall Arts responded in a letter on August 3, 2016, clarifying its position that lost rental income should be calculated based on the tenant fit-out date and not any other completion date (e.g., substantial completion of the building). Hall Arts also attached the requested additional documents.

Hall Arts and Hanover met on August 16, 2016 to discuss the delay claim. While the parties came to no conclusions at the meeting, Hall Arts understood Hanover to state that it would provide Hall Arts with a coverage determination by the end of August. On August 30, 2016, following review of Hall Arts's documentation, Cois, acting on behalf of Hanover, sent Hall Arts another request for documentation. As of the time of this lawsuit, Hanover has not yet made a determination on Hall Arts's delay coverage claim.

Hall Arts brought this lawsuit in state court to enforce the delay in completion coverage part and Hanover's duty under Texas law to investigate and respond to its policyholder's request for coverage. In its state-court petition, Hall Arts alleges claims for breach of contract, breach of the duty of good faith and fair dealing, and violations of Chapter 541 and Chapter 542 of the Texas Insurance Code. Hanover removed the case to this court.

As part of the pretrial discovery process, Hall Arts disclosed an expert report from Bryan T. Byrd ("Byrd"), President of Synergen Consulting International, LP, Hall Arts's

retained expert. Byrd's report focuses on delay of the tenant fit-out date resulting from the Weather Event's delay of completion of permanent parts of KPMG Plaza that were critical to commencing KPMG's fit-out. Byrd opined that the Weather Event resulted in 48 days of lost rental income from KPMG.[8] Hall Arts also submitted a report by Kevin O'Toole ("O'Toole"), a Managing Director with Navigant Consulting. O'Toole's report relied on Byrd's finding of a 48-day delay to estimate that Hall Arts's lost rental income and soft costs totaled $██████ as result of the delay caused by the Weather Event. This amount included $██████ of lost KPMG rental income and $█████ in additional soft costs. The soft costs amount covers $█████ of insurance premiums that Hall Arts paid to extend coverage under the Policy from March 8, 2015 to June 15, 2015, as well as a holdover penalty of $██████ paid by KPMG and reimbursed by Hall Arts.[9]

Hanover submitted an expert report by Cois, which focused instead on the substantial completion date and completion of top-out/dry-in dates set forth in the Turner construction contract. Based on these contractual milestones, Cois concluded that no delay resulted from the Weather Event because the top-out/dry-in date was not delayed and the substantial completion of KPMG Plaza as a whole, including the restaurant, retail space, and art walk,

---

[8]Byrd determined that the date of commencing KPMG's tenant fit-out was delayed from December 22, 2014 to February 18, 2015 (58 days) as a result of the Weather Event on October 13, 2014. KPMG was not scheduled to start its tenant fit-out until January 1, 2015, however, so only 48 days for the 58-day difference was attributable to the Weather Event.

[9]A holdover penalty is a fee that a tenant who overstays the lease must pay to the landlord in order to extend occupation of the space temporarily.

was delayed as a result of other events.

Hanover now moves for summary judgment on all of Hall Arts's claims, and it moves to exclude Hall Arts's expert witness testimony to be offered through Byrd and O'Toole.[10] Hall Arts cross-moves for summary judgment on all of its claims, and it moves to exclude the opinions and proposed testimony of Hanover's expert, Cois.  All motions are opposed.

## II

Hanover moves for summary judgment on claims for which Hall Arts will have the burden of proof at trial.  Because Hall Arts will have the burden of proof, Hanover's burden at the summary judgment stage is to point the court to the absence of evidence of any essential element of Hall Arts's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once it does so, Hall Arts must go beyond its pleadings and designate specific facts demonstrating that there is a genuine issue for trial.  *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  An issue is genuine if the evidence is such that a reasonable jury could return a verdict in Hall Arts's favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Hall Arts's failure to produce

---

[10]Hanover has filed objections in which it challenges some of the evidence included with Hall Arts's response to Hanover's motion for summary judgment.  Hanover primarily objects to the evidence as lacking foundation and as inadmissible hearsay.  The hearsay challenge includes Byrd's report, O'Toole's report, and the May 13, 2015 memo from Craig Hall.  To the extent the court has relied on evidence to which Hanover objects, the objections have been considered on the merits and are overruled.  As to evidence to which an objection has been made but on which the court has not relied for any purpose in deciding Hanover's motion for summary judgment, the objections are overruled as moot.

proof as to any essential element of a claim renders all other facts immaterial. *TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory where Hall Arts fails to meet this burden. *Little*, 37 F.3d at 1077.

Because Hall Arts will have the burden of proof at trial on its claims, to be entitled to summary judgment on these claims, it "must establish 'beyond peradventure all of the essential elements of the claim[.]'" *Bank One, Tex. N.A. v. Prudential Co. Of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). This means that Hall Arts must demonstrate that there are no genuine and material fact disputes and that it is entitled to summary judgment as a matter of law. *See Martin v. Alamo Cmy. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). "The court has noted that the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923-24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marin Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

III

The court turns first to Hall Arts's and Hanover's summary judgment motions.[11]

---

[11]Because the court is denying *infra* at § IV the motions of Hanover and Hall Arts to exclude expert testimony, the court will consider the expert reports of Cois, Byrd, and O'Toole when deciding the summary judgment motions.

A

The court first addresses Hall Arts's breach of contract claim. Hall Arts alleges that Hanover breached the Policy by (1) requesting documents not required by the Policy as a precondition of coverage, and (2) failing to cover both lost rental income and soft costs, including a holdover penalty and 48 days of insurance premiums, arising during a delay period caused by the Weather Event.

The parties do not dispute that Texas law applies in this case. In Texas, a breach of contract claim requires proof four elements: "(1) the existence of a valid contract, (2) plaintiff's performance of duties under the contract, (3) defendant's breach of contract, and (4) damages to the plaintiff resulting from the breach." *Hoffman v. L & M Arts*, 2011 WL 3567419, at *4 n.2 (N.D. Tex. Aug. 15, 2011) (Fitzwater, C.J.) (citing *Lewis v. Bank of Am. NA*, 343 F.3d 540, 544-45 (5th Cir. 2003)); *see also Palmer v. Espey Huston & Assocs.*, 84 S.W.3d 345, 353 (Tex. App. 2002, pet. denied).

The court focuses solely on the third element: whether Hanover breached the Policy.

B

Hall Arts moves for summary judgment on its claim that Hanover breached the Policy by requesting documents not required by the Policy as a precondition of coverage and by changing the scope of documents it requested. Hanover responds that no language of the Policy bars it from requesting the construction schedules or additional documentation of the progress of the project. The court agrees with Hanover.

The Policy specifies that, when making a coverage determination, Hanover considers

certain items, such as "the probable experience during the time of 'delay' had no loss occurred" as well as "pertinent sources of information and reports including. . . reports on feasibility and status." *Id.* at 56. Hall Arts offers no reason why the documentation that Hanover requested does not qualify either as "reports on feasibility and status" or as related to "the probable experience during the time of 'delay' had no loss occurred." Nor does Hall Arts point to any language in the Policy that precluded Hanover, as it proceeded through its investigation, from changing the scope of information required to make a coverage determination.

Accordingly, the court denies Hall Arts's motion for summary judgment on its breach of contract claim based on Hanover's request for documents not required by the Policy.

## C

The court turns next to Hall Arts's claim that Hanover breached the Policy by failing to cover Hall Arts's lost rental income and soft costs. In determining whether Hanover failed to pay a valid delay coverage claim, the court first assesses whether Hall Arts has shown that the Weather Event resulted in a qualifying delay period under the Policy. The court focuses specifically on how a delay period under the Policy can be measured. Hall Arts maintains that it can establish a delay period by showing delay to tenant fit-out of the KPMG-leased space. Hanover posits that the Policy only covers delays to construction milestones for the entire KPMG Plaza, as set forth in the contract between Hall Arts and Turner.

If delay to the tenant fit-out of the KPMG-leased space qualifies as a delay period under the Policy, the court then determines whether a reasonable jury could find that the

Weather Event resulted in lost rental income and soft costs to Hall Arts. When considering lost rental income, the court looks to whether the Weather Event delayed the date KPMG began paying rent, per the terms of the KPMG lease.

1

Hanover maintains that Hall Arts cannot show that Hanover breached the delay coverage provision because Hall Arts cannot establish the requisite "delay period" during which it could recover soft costs and rental income.

The Policy defines "delay period" as "the period of time the completion of the construction, erection, or fabrication of a covered 'building or structure' is 'delayed' as a result of direct physical loss or damage caused by a covered peril to property covered under the Builders' Risk Coverage form to which this coverage part is attached." P. 3/30/18 App. 49. Hanover posits that the covered "building or structure" is the entire KPMG Plaza, as defined by the jobsite description in the delay coverage schedule. Hanover contends that Hall Arts has not presented evidence that the delay coverage provision applies to the Weather Event because the overall construction of KPMG plaza was not delayed. Hall Arts responds that the delay to KPMG's tenant fit-out of the KPMG-leased space qualifies as a "delay period" because several items, including Bus Duct B and the fire protection and life-safety equipment in the building, qualify under the Policy as the covered "building or structure."

2

The court disagrees with Hanover's characterization of the delay coverage provision. The Policy does not define a covered "building or structure" with reference to the jobsite

description.  Instead, the Policy defines "Buildings or Structures" in the definition section to mean: "a. buildings; b. structures; c. materials and supplies that will become a permanent part of the buildings or the structures; and d. foundations, excavations, grading, filling, attachments, permanent fencing, and other permanent fixtures."  P. 3/30/18 App. 44. Therefore, the materials and supplies that would become a permanent part of the office building at KPMG Plaza fall under subsection c of the Policy's definition of "Buildings or Structures."

The court not persuaded by the two cases that Hanover cites for the proposition that builder's risk coverage provisions do not cover delays to the construction of components of the overall project.  In *W2001Z/15 CPW Realty, LLC v. Lexington Ins. Co.*, 9 N.Y.S.3d 18 (N.Y. App. Div. 2015), the court looked to the text of the insurance policy's delay-in-completion provision.  That provision limited coverage to "[delays] in completion of the project described in the Declarations portion of this Policy," which was the entire condominium complex and not individual condominium units.  *Id.* at 18.  In *James F. Campenella Construction Co. v. Great American Insurance Co. of New York*, 2010 WL 4812990, at *5 (E.D. Pa. Nov. 24, 2010), the court similarly relied on the text of the insurance policy, which covered soft costs during the period of delay in completion of the "project."  The "project" was defined as the total construction of the existing structure at 1103-13 Locust Street in Philadelphia, Pennsylvania and the seven floors being added.  *Id.* These cases are distinguishable from the instant case, which involves a delay coverage provision that does not explicitly define coverage with reference to the overall project.

Nor is the court persuaded by Hanover's textual argument that the term "and," which is found following subsection c in the Policy definition of "building or structure," is conjunctive and therefore requires Hall Arts to establish delay to a "building or structure," i.e., the entire KPMG Plaza, as opposed to items that represent but one component of a building or structure. Texas courts have accepted both conjunctive and disjunctive constructions of the term "and." *See Trammell Crow Residential Co. v. Am. Prot. Ins. Co.*, 574 Fed. Appx. 513, 518 (5th Cir. 2014) (per curiam) (collecting cases).

> This construction [of *and* as *or*], however, is never resorted to except for strong reasons and the words should never be so construed unless the context favors the conversion; as where it must be done in order to effectuate the manifest intention of the user; and where not to do so would be to render the meaning ambiguous, or result in an absurdity; or would be tantamount to a refusal to correct a mistake.

*Id.* (citing *Bd. of Ins. Commr's of Tex. v. Guardian Life Ins. Co. of Tex.*, 180 S.W.2d 906, 908 (1944)). In the instant case, interpreting the term "and" as conjunctive in the definitional section would create an ambiguity. Such a reading would be incongruous with the delay coverage provision's reference to "a covered building *or* structure." P. 3/30/18 App. 44 (emphasis added). In other words, under the delay coverage provision, there would be coverage for delay in constructing, erecting, or fabricating a building *or* structure. But under the definition of "Buildings or Structures," an insured would not be covered unless the structure were both a building and a structure. P. 3/30/18 App. 44. The court concludes that reading "and" in the definitional provision as disjunctive is more consistent with the Policy as a whole. Hall Arts's evidence of delay to the construction of "materials and supplies that

will become a permanent part of the buildings or the structures" of KPMG Plaza is sufficient to avoid dismissal of its breach of contract claim at the summary judgment stage.

Accordingly, the court declines to dismiss Hall Arts's breach of contract claim on the basis that the delay coverage provision does not apply to the Weather Event because the Weather Event did not delay construction of the overall KPMG Plaza.

3

Hanover also maintains that the court should dismiss the breach of contract claim because Hall Arts has not presented evidence from which a reasonable jury could find that a loss in rental income resulted from a delay to construction of the office building at KPMG Plaza.

The Policy covers "actual loss of rental income incurred during the delay period" that "arises out of a delay to a building or structure at a jobsite described on the Delay in Completion Schedule." P. 3/30/18 App. 51. The central question, then, is whether the Weather Event delayed the date that rent from KPMG was scheduled to begin accruing. The KPMG lease specifies that rent will accrue beginning on the date that is the earlier of: (i) KPMG's commencement of occupancy for the normal conduct of business; or (ii) nine months following the delivery date, so long as the date is not earlier than the date of substantial completion of landlord's premises work or substantial completion of landlord's building work. In analyzing whether the lost rental income provision applies, the court examines whether the Weather Event resulted in delays to construction of the KPMG-leased space and whether such delays ultimately delayed the delivery date or the commencement

of KPMG's occupancy of the space.

First, the court concludes that there is a material factual dispute regarding whether delay to the commencement of occupancy of the premises by KPMG for the normal conduct of business resulted from the Weather Event. The parties disagree about the date on which KPMG could actually have occupied its office space, but for the Weather Event. █████

███████████████████████████████████████

██████████████████████. Hanover, relying on the KPMG lease, maintains that the earliest KPMG could actually have occupied the building was July 1, 2015. Hanover points to the latest date of completion of the Landlord's Building Work, set by the lease as June 30, 2015, as evidence that KPMG could not occupy the building before July 1, 2015.[12] Under the KPMG lease, the parties dispute whether, but for the Weather Event, rent would have begun accruing on June 1, 2015 or July 1, 2015. The date rent begins accruing, per the KPMG lease, is the *earlier* of KPMG's actual occupancy of the building or the date nine months after the delivery date (at the latest, July 1, 2015). The date KPMG's actual occupancy was scheduled to start, but for the Weather Event, is central to determining whether actual rental income was lost.[13]

---

[12]The lease states that the "Landlord shall Substantially Complete the Landlord's Building Work *by* June 30, 2015." D. 3/30/18 App. 234 (emphasis added). This language does not foreclose the possibility that Hall Arts's actual occupancy was scheduled to begin June 1, 2015, because substantial completion of landlord's building work could occur before that date.

[13]Hanover acknowledges, and Hall Arts does not dispute, that (ii) contemplates a July 1, 2015 date. Neither party addresses whether the Property was actually delivered by

Second, the parties also present conflicting evidence regarding the extent of delay resulting from other factors unrelated to the Weather Event. It is undisputed that the electrical storm occurred on October 13, 2014; that KPMG's tenant improvements were originally scheduled to begin on December 22, 2014; and that KPMG later postponed commencement of tenant fit-out until January 1, 2015. Hanover points to DFRD's shutdown of tenant fit-out for several weeks in January. It is undisputed that KPMG began the layout of its tenant space on January 14, 2015, and that DFRD halted the tenant buildout on January 20, 2015. Turner then resumed tenant buildout on January 30, 2015, a few weeks after agreeing with DFRD regarding certain required safety items. Hanover presents evidence of delay by DFRD from January 14, 2015 to February 17, 2015 that contributed to delay in the tenant fit-out process and the date when KPMG could occupy the office building. Hall Arts adduces its own evidence that the requirements imposed by DFRD did not ultimately differ

---

October 1, 2014. It appears, based on the rental income provision of the lease, that if delivery occurred in compliance with the terms of the lease, then KPMG's actual occupancy on July 27, 2015 dictates, at the latest, a July 1, 2015 commencement date (the earlier of the two dates in the rental income provision). And if rent would have begun accruing on July 1, 2015 at the latest, then actual occupancy on July 27, 2015 would not have delayed the date rent began accruing because it would still begin accruing by July 1, 2015, which is the earlier of the dates set by (i) and (ii). If rent would have begun accruing on June 1, 2015, however, then KPMG's commencement of actual occupancy on July 27, 2015 would have delayed the date rent began accruing to July 1, 2015 at the latest. In this case, however, KPMG began paying rent on the date of its actual occupancy—July 27, 2015—which, according to KPMG's lease, suggests that the date of actual occupancy occurred prior to the delivery date plus nine months. The court thus cannot determine at the summary judgment stage the Weather Event's role in delaying rental income.

from what the Project originally contemplated and thus did not result in delay.[14]  It is undisputed that delays caused by DFRD constitute an order by a civil authority, which would not qualify as a "covered peril" under the Policy.[15]  The extent of DFRD's delays to KPMG's occupancy is thus dispositive to the question of Hanover's liability under the delay coverage provision.[16]



---

[14]Byrd testified that Turner did not contemplate the five requirements imposed by DFRD, but stated that those five requirements were revised on January 30, 2015 to cover only the items originally scheduled to be completed before tenant fit-out began—tie-in of the fire protection and life safety systems on the critical path to commencing tenant fit-out.

[15]Although Hall Arts states that Hanover fails to show that the shutdown by DFRD is an excluded "order by civil authority," it presents no supporting argument for this proposition and focuses instead on an argument that DFRD did not actually cause any delay to KPMG's occupancy.

[16]Because the court holds that there at least exists a genuine factual dispute regarding DFRD's role in the delay, the court does not reach Hanover's argument that Turner also contributed to the delay.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████[17]

Given the significant number of disputed material facts, the court is unable to make a determination on whether and to what extent the Weather Event caused Hall Arts to lose rental income from KPMG. It is thus unable to determine whether Hanover breached the Policy by failing to cover Hall Arts's lost rental income claim.

4

Hanover also maintains that Hall Arts has not shown that Hanover breached the Policy because Hall Arts has not presented evidence from which a reasonable jury could find that the Weather Event resulted in soft costs. Hall Arts posits that the 48-day delay to KPMG's occupancy arising from the Weather Event required Hall Arts to extend its insurance policy to cover the additional construction. Hall Arts also seeks to claim a one-month holdover penalty it reimbursed as a result of KPMG's being unable to move into KPMG Plaza according to schedule.

---

[17]The court gives the words of the actual loss of rental income provision their plain meaning. *See Evanston Ins. Co. v. Lapolla Indus., Inc.*, 93 F.Supp.3d 606, 612 (S.D. Tex. 2015) (Rosenthal, J.) ("As in all contracts, the court looks first to the language of the contract itself, and [w]hen there is no ambiguity, it is the court's duty to give the words used their plain meaning."), *aff'd*, 634 Fed. Appx. 439 (5th Cir. 2015).

The court denies Hanover's motion for summary judgment on this basis for the same reasons set out *infra* at § IV(A)(3). Given the number of genuine issues of material facts, the court is unable to make a determination at the summary judgment stage on whether and to what extent the Weather Event delayed Hall Arts's occupancy of KPMG Plaza. It is thus unable to determine whether Hanover is liable for the holdover penalty and the 48 additional days of insurance premiums.

Accordingly the court denies Hanover's motion for summary judgment and Hall Arts's cross-motion for summary judgment on the breach of contract claim.[18]

## D

The court turns next to Hall Arts's claim that Hanover breached its duty of good faith and fair dealing by delaying payment on Hall Arts's delay claim for over 28 months and by conducting an investigation designed to defeat a finding of coverage.

## 1

"Under Texas law, there is a duty on the part of the insurer to deal fairly and in good faith with an insured in the processing of claims." *Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 459 (5th Cir. 1997) (citing *Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987)).

---

[18]Because the court holds that material disputed facts exist regarding whether the Weather Event delayed KPMG's occupancy, the court does not reach the issue of whether the Policy covers the holdover penalty.

A cause of action for breach of the duty of good faith and fair dealing exists when the insurer has no reasonable basis for denying or delaying payment of a claim or when the insurer fails to determine or delays in determining whether there is any reasonable basis for denial. In order to sustain such a claim, the insured must establish the absence of a reasonable basis for denying or delaying payment of the claim and that the insurer knew, or should have known, that there was no reasonable basis for denying or delaying payment of the claim. The insured must prove that there were no facts before the insurer which, if believed, would justify denial of the claim. However, insurance carriers maintain the right to deny questionable claims without being subject to liability for an erroneous denial of the claim. A bona fide controversy is sufficient reason for failure of an insurer to make a prompt payment of a loss claim. As long as the insurer has a reasonable basis to deny or delay payment of a claim, even if that basis is eventually determined by the fact finder to be erroneous, the insurer is not liable for the tort of bad faith.

*Id.* (citations omitted).

The focus of a bad faith inquiry is on the reasonableness of the insurer's conduct in rejecting or delaying payment of the claim, *see Universe Life Insurance Co. v. Giles*, 950 S.W.2d 48, 49 (Tex. 1997), which is determined by viewing the facts available to the insurer at the time of denial, *see Viles v. Security National Insurance Co.*, 788 S.W.2d 566, 567 (Tex. 1990). An insurer breaches its duty of good faith if it denies a claim and its liability has become reasonably clear. *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex. 1998). Moreover, an insurer cannot escape liability by failing to investigate a claim so that it can contend that liability was never reasonably clear, and it breaches the duty of good faith and fair dealing by failing reasonably to investigate a claim. *See Universe Life*, 950 S.W.2d at 56 n.5 (citing *Arnold*, 725 S.W.2d at 167). An insurer's duty to investigate,

however, is limited. *See State Farm*, 963 S.W.2d at 44. "The scope of the appropriate investigation will vary with the claim's nature and value and the complexity of the factual issues involved." *Id.* If, after reasonable investigation, the insurer has evidence showing that the insured's claim may be invalid, a bad faith action is not viable. *See Tucker v. State Farm Fire & Cas. Co.*, 981 F. Supp. 461, 465 (S.D. Tex. 1997) (citing *Aranda v. Ins. Co. of N. Am.*, 748 S.W.2d 210, 213 (Tex. 1988)).

2

Hall Arts contends that Hanover decided not to request documents it knew were in existence at the time Hall Arts submitted its delay claim, dragged out requests for irrelevant documents over eleven months, failed to request that Hall Arts provide a sworn proof of loss, and engaged two consultants who prepared three incomplete and inconclusive reports. Hanover maintains that it is entitled to summary judgment on Hall Arts's bad faith claim because a bona fide dispute exists regarding Hanover's liability for Hall Arts's lost rental income and soft costs. The court agrees with Hanover.

"[T]he existence of a bona fide controversy is a sufficient reason for failure of an insurer to make a prompt payment of a loss claim." *Robinson v. State Farm Fire & Cas. Co.*, 13 F.3d 160, 162 (5th Cir. 1994) (internal quotation marks and citations omitted). In this case, Hanover retained two consultants to evaluate Hall Arts's claims. These consultants determined that additional documentation was required to evaluate the claim. And given the number of material disputed facts related to the delays to tenant fit-out, the court concludes that a reasonable jury could only find that Hanover had a reasonable basis for delaying

payment of Hall Arts's claim.

The facts that Hall Arts cites in support of this claim are insufficient to evince bad faith by Hanover and to avoid summary judgment. Hall Arts has merely presented conclusory assertions and has not produced evidence creating a genuine issue of material fact regarding whether Hanover failed to pay or delayed evaluating the claim in bad faith. *See, e.g., Orthopedic & Sports Injury Clinic v. Wang Lab. Inc.*, 922 F.2d 220, 224 (5th Cir. 1991) ("[T]here is a level of conclusoriness below which an affidavit must not sink if it is to provide the basis for a genuine issue of material fact."). Accordingly, the court dismisses Hall Arts's claim for breach of the duty of good faith and fair dealing. *See, e.g., Vought Aircraft Indus., Inc. v. Falvey Cargo Underwriting, LTD.*, 729 F.Supp.2d 814, 840 (N.D. Tex. 2010) (Fitzwater, C.J.) (dismissing claim for breach of the duty of good faith and fair dealing at summary judgment stage).

E

The court now addresses Hall Arts's Texas Insurance Code claims. Hall Arts alleges that Hanover violated Chapter 541 of the Texas Insurance Code by failing to attempt to settle after liability became reasonably clear, in violation of Tex. Bus. & Com. Code Ann. § 541.060(a)(2)(A); by failing to affirm or deny the claim in a reasonable time, in violation of § 541.060(a)(4); and by failing to conduct a reasonable investigation, in violation of § 541.060(a)(7).

1

Section 541.003 of the Texas Insurance Code precludes a person from engaging "in

this state in a trade practice that is defined in this chapter as or determined under this chapter to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance." Tex. Ins. Code Ann. § 541.003 (West 2018). Section 541.060 lists a number of unfair settlement practices, including: "failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of . . . a claim with respect to which the insurer's liability has become reasonably clear[,]" Tex. Ins. Code Ann. § 541.060(a)(2)(A) (West 2018); "failing within a reasonable time to . . . affirm or deny coverage of a claim to a policyholder[,]" Tex. Ins. Code Ann. § 541.060(a)(4)(A) (West 2018); and "refusing to pay a claim without conducting a reasonable investigation with respect to the claim." Tex. Ins. Code Ann. § 541.060(a)(7) (West 2018).

2

Because Hall Arts has failed to present evidence that establishes a genuine issue of material fact concerning its claim for breach of the duty of good faith and fair dealing, the court concludes that its § 541 claims under § 541.060(a)(2)(A) and § 541.060(a)(7) also fail.

A "bona fide dispute" regarding insurance coverage precludes liability for breach of the duty of good faith and fair dealing and violations of the Texas Insurance Code. *See Higginbotham*, 103 F.3d at 460 (citing *Emmert v. Progressive Cnty. Mut. Ins. Co.*, 882 S.W.2d 32, 36 (Tex. App. 1994, writ denied)); *Douglas v. State Farm Lloyds*, 37 F.Supp.2d 532, 544 (S.D. Tex. 1999). "Texas courts have clearly ruled that these extra-contractual tort claims require the same predicate for recovery as bad faith causes of action in Texas." *See Higginbotham*, 103 F.3d at 460; *Nunn v. State Farm Mut. Auto Ins. Co.*, 729 F.Supp.2d 801,

811 (N.D. Tex. 2010) (Fitzwater, C.J.) (same). "The insurer will not be faced with a tort suit for challenging a claim of coverage if there was any reasonable basis for denial of that coverage." *Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 525 (5th Cir. 2015) (citing *Higginbotham*, 103 F.3d at 459) (first citation and internal quotation marks omitted); *see also Harrison v. Int'l Catastrophe Ins. Managers, LLC*, 2012 WL 1231071, at *8 (E.D. Tex. Mar. 22, 2012) ("When claims under the Texas Insurance Code and the DTPA are joined with a claim for breach of the duty of good faith and fair dealing, and the statutory claims are based on the same theory which underlies the bad faith claim—namely, denial of policy benefits without a reasonable basis—then those DTPA and Insurance Code claims must fail if the bad faith claim fails."), *report and recommendation adopted*, 2012 WL 1232020 (E.D. Tex. Apr. 12, 2012). In this case, for the same reasons that Hall Arts's claim for breach of the duty of good faith and fair dealing fails, its § 541.060(a)(2)(A) and § 541.060(a)(7) claims fail as well. Accordingly, the court dismisses these extracontractual claims with prejudice.

3

Defendants have not carried their burden to establish that Hall Arts's claim under § 541.060(a)(4)(A) for "failing within a reasonable time to . . . affirm or deny coverage of a claim to a policyholder" automatically fails because the court has dismissed Hall Arts's breach of the duty of good faith and fair dealing claim.

For the bona fide dispute rule to apply, the extracontractual claim must share "the same predicate for recovery as bad faith causes of action in Texas." *Higginbotham*, 103 F.3d

at 460.  In other words "the statutory claims [must be] based on the same theory which underlies the bad faith claim—namely, denial of policy benefits without a reasonable basis[.]" *Harrison*, 2012 WL 1231071, at *8.  In this case, it is not apparent that Hanover's reasonable basis for denying Hall Arts's claim automatically absolves it of liability regarding the promptness of making a determination.  Because Hanover offers no evidence or argument that Hall Arts's claim under § 541.060(a)(4)(A) shares the same predicate for recovery as Hall Arts's bad faith action, the court declines to grant Hanover's motion for summary judgment on this claim.

## F

Hall Arts also alleges that Hanover violated the Texas prompt-payment statute by failing to timely request documentation to evaluate the claim, in violation of § 542.055;[19] by not providing notice of its acceptance or rejection of the claim, in violation of § 542.056,[20] and by improperly delaying payment of the claim, in violation of § 542.058.[21]

---

[19]An insurer must acknowledge receipt of the claim, commence any investigation of the claim, and request from the claimant all items, statements, and forms that the insurer reasonably believes, at that time, will be required from the claimant no later than the 15th day after the date an insurer receives notice of a claim.  *See* Tex. Ins. Code Ann. § 542.055 (West 2018)

[20]Insurers are required to "notify a claimant in writing of the acceptance or rejection of a claim not later than the 15th business day after the date the insurer receives all items, statements, and forms required by the insurer to secure final proof of loss."  Tex. Ins. Code Ann. § 542.056 (West 2018).

[21] Tex. Ins. Code Ann. § 542.058 provides:

[e]xcept as otherwise provided, if an insurer, after receiving all items, statements, and forms reasonably requested and required

1

"The Texas prompt-payment statute provides for additional damages when an insurer wrongfully refuses or delays payment of a claim." *Metro. Hosp. Partners, Ltd. v. Lexington Ins. Co.*, 84 F.Supp.3d 553, 571 (S.D. Tex. 2015) (Rosenthal, J.) (citing *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 16 (Tex. 2007)). Under Chapter 542, the insured must establish: "(1) a claim under an insurance policy; (2) for which the insurer is liable; and (3) that the insurer has not followed one or more sections of [Chapter 542] with respect to the claim." *Beaumont Pres. Partners, LLC v. Int'l Catastrophe Ins. Managers, LLC*, 2011 WL 6707287, at *11 (E.D. Tex. Oct. 6, 2011), *report and recommendation adopted*, 2011 WL 6709920 (E.D. Tex. Dec. 21, 2011); *see also Metro Hosp. Partners*, 84 F.Supp.3d at 571 (citing *Harris v. Am. Prot. Ins. Co.*, 158 S.W.3d 614, 623 (Tex. App. 2005, no pet.)) ("An insurer will not be held liable for violating [the prompt-payment statute] unless it is found liable for the underlying insurance claim.").

2

Hanover posits that the court should dismiss Hall Arts's Chapter 542 claims because Hall Arts failed to respond to all of Hanover's requests for information. The court disagrees. Hanover has not presented any evidence that would enable a reasonable jury to find that Hall

under Section 542.055, delays payment of the claim for a period exceeding the period specified by other applicable statutes or, if other statutes do not specify a period, for more than 60 days, the insurer shall pay damages and other items as provided by Section 542.060.

Arts failed to provide "all items, statements, and forms reasonably requested and required under Section 542.055."[22] The court thus declines to dismiss Hall Arts's Chapter 542 claims on this basis.

Because genuine issues of material fact remain regarding Hanover's liability for Hall Arts's delay claim, the court is unable to make a determination on Hall Arts's Chapter 542 claims at the summary judgment stage. Accordingly, the court denies Hall Arts's and Hanover's motions for summary judgment on this claim.

IV

The court will now consider Hanover's and Hall Arts's motions to exclude expert witness testimony.

A

The court decides these motions in its role as gatekeeper concerning the admissibility of expert testimony. *See, e.g., Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) ("[Fed. R. Evid.] 702 charges trial courts to act as 'gate-keepers'"). "[W]hile exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits." *Id.* at 250.

---

[22]Hanover relies on *S.R. Residence, LLC v. Lexington Ins. Co.*, 2013 WL 1204709, at *4 (S.D. Tex. Mar. 25, 2013), for its holding that "[the insurer's] obligation to accept or reject Plaintiff's claim was never triggered, given that Plaintiff failed to respond to [the insurer's] repeated requests for documents required for proof of the claim." In the instant case, however, a reasonable jury could find from the summary judgment evidence that Hall Arts was generally responsive to Hanover's requests and produced documents upon request on several occasions.

The court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

An expert must be qualified. "Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training or education.'" *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting Rule 702). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Id.* (citing *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).

To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone*, 288 F.3d at 245 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993)). "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593).

"Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Id.* (quoting *Daubert*, 509 U.S. at 592-93). The testimony must constitute "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

"Whether an individual is qualified to testify as an expert is a question of law. . . .

Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citations omitted). The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

B

The court first addresses Hanover's motion to exclude Byrd and O'Toole as Hall Arts's testifying expert witnesses.

1

Byrd was retained to perform a forensic schedule analysis to identify critical events and factors that contributed to the delayed start date of tenant build-out. O'Toole was initially engaged by Hall Arts to prepare its first party claim for loss of rental income, additional soft costs, and general administrative costs. O'Toole's expert report relied on Byrd's conclusion that a 48-day delay in KPMG's lease resulted from the Weather Event. O'Toole estimated, based on KPMG's lease and the rent rolls, that KPMG was obligated by the lease to pay Hall Arts $ ███████ per day in rent. O'Toole concluded that the total loss of net rental income resulting from the Weather Event was $ ███████. O'Toole also concluded that the 48-day delay in the commencement date of KPGM's lease led Hall Arts to incur $ █████ in soft costs, which included $ ██████ in extended insurance premiums and $ ██████ of a holdover penalty.

Hanover does not dispute that Byrd and O'Toole are both qualified to testify regarding forensic accounting and construction schedule analysis. Hanover maintains instead that Byrd and O'Toole's opinions are not relevant. It posits that the Policy assesses delay in completion coverage based on the delayed completion of the project rather than on the tenant's build out schedule. Hanover contends that both Byrd's report and O'Toole's report are irrelevant because they analyze the Weather Event's effect on the tenant build out schedule and delays to tenant occupancy rather than the overall completion date, which is the relevant date for establishing a delay period under the Policy. The court disagrees for the reasons explained *supra* at § III(C)(2). Under *Daubert* the expert's testimony must be relevant. To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone*, 288 F.3d at 245 (quoting *Daubert*, 509 U.S. at 591). "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Kirby Inland Marine Inc.*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 593); *see also* Rule 702(d) (requiring that "expert has reliably applied the principles and methods to the facts of the case").

Because the date of KPMG's actual occupancy may trigger the accrual of rent under the KPMG lease, delays to KPMG's tenant fit-out and resulting delays to its actual occupancy are relevant to whether rental income was lost. O'Toole's and Byrd's opinions will be helpful to the finder of fact in determining whether Hanover was liable for Hall Arts's claim and, ultimately, whether Hanover breached the Policy by delaying or denying payment

of the claim.

Accordingly, the court declines to strike O'Toole's and Byrd's testimony on the basis that its lacks relevance.

3

Hanover also maintains that O'Toole's expert report is unreliable for a number of reasons, such as that ███████████████████████████████████████████████

████████████████████████████████████████████; O'Toole did not consider certain documents when determining whether the holdover penalty resulted from the Weather Event; O'Toole did not conduct an independent investigation of the claimed soft costs; and O'Toole fails to explain why all 48 days of the insurance extension are attributable solely to the Weather Event.

Hanover's argument is insufficient to warrant excluding O'Toole's expert opinions. In the process of investigating lost rental income and soft costs resulting from the Weather Event, O'Toole avers that he

> met with Hall Arts and Turner personnel and considered all relevant documentation produced in this matter, consisting of hundreds of pages of documents. From August 5, 2015 through the date [he] submitted [his] expert report, [he] engaged in seven conference calls and four in-person meetings with Hall Arts and Turner personnel concerning the construction delay and Hall Arts' internal accounting to independently measure and verify the loss of rental income and soft costs. . . . [he] carefully reviewed all underlying supporting accounting information and correspondence concerning the soft costs and loss of rental income relating to the delay period measured by Byrd.

P. 4/20/18 Resp. to Hanover App. 467. In light of O'Toole's independent investigation of

the relevant supporting documentation, the court concludes that his reliance upon Byrd's calculations is proper. *See GWTP Invs, L.P. v. SES Americom, Inc.*, 2007 WL 7630459, at *5 (N.D. Tex. Aug. 3, 2007) (Ramirez, J.) ("An expert may rely upon figures calculated by another expert so long as he conducts an independent investigation of those figures.").

Regarding O'Toole's calculation of lost rent, the holdover penalty, and the extended insurance premiums, the court analyzes the internal logic of the methodology used by O'Toole in reaching his conclusions, "determin[ing] whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592) (second alteration in original). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

In his expert report, O'Toole describes his methodology for arriving at lost net rental income of $██████. O'Toole first considered the terms of the KPMG Lease, which provide that KPMG was to lease 176,016 square feet spanning the eighth through fifteenth floor of the office building at $██ per square foot, and 6,096 square feet on the ninth floor at $██ per square foot. O'Toole estimated that the saved operating expenses, including those associated with elevator operations, cleaning, HVAC systems, management fees, maintenance, payroll, and courtesy patrol, for the days KPMG Plaza did not operate at full capacity, totaled $██████ per day. He then multiplied this number by the 48-day delay and the proportion of the total square footage leased by KPMG (57.66%). He deducted this

amount from the total lost rental revenue to reach $██████, the total loss of net rental income. O'Toole also explains that he attributed the holdover penalty resulting from KPMG's extension of its stay in its previously leased space to the 48-day delay measured by Byrd because this holdup delayed KPMG's date of actual occupancy of KPMG Plaza. O'Toole also estimated that Hall Arts incurred an additional $██ per day in additional insurance premiums, which arose out of Hall Arts's extension of the builders' risk insurance policy to cover the additional time needed to complete tenant fit-out of the KPMG-leased space.

████████████████████████████████████████████

████████████████████████████████████. But Hanover offers no evidence supporting its argument and does not appear to challenge Hall Arts's methodology for calculating lost rental income. Regarding the holdover penalty and insurance premiums, Hanover merely posits that O'Toole did not consider other factors that led Hall Arts to incur such costs; Hanover does not show why O'Toole's finding of causation is so unreliable as to merit exclusion. *See, e.g., Curlee v. United Parcel Serv., Inc.*, 2014 WL 11516719, at *6 (N.D. Tex. Dec. 12, 2014) (Solis, C.J.) ("[T]he Court does not require experts to know every conceivably relevant fact in order to testify."). The court thus concludes that Hanover's various challenges go to the weight of O'Toole's testimony, not its admissibility. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Because Hanover fails to show that O'Toole's testimony lacks reliability, the court denies Hanover's motion to exclude O'Toole as an expert.

4

Hanover objects to Byrd's testimony as unreliable on the ground that Byrd incorrectly stated that the damage to Bus Duct B was not repaired until December 17, 2016; Byrd did not consider two separate HVAC chiller leaks into Bus Duct B that occurred after Bus Duct B was repaired on November 25, 2017; Byrd incorrectly noted that certain workaround options that would have delayed tenant fit-out relied on power distribution through Bus Duct B; and Byrd did not consider facts in the record that contradict his report, including that Turner did not anticipate the fire safety requirements imposed by DFRD in January 2015.

The court holds that such arguments are insufficient to warrant excluding Byrd's testimony. In his expert report, Byrd avers that he relied upon all records and documentation made available during the course of litigation up until the time his expert report was submitted. Byrd also testified in his deposition that he considered facts such as the two other HVAC chiller leaks and DFRD's interference with tenant fit-out but simply came to the conclusion that such factors did not impact the critical path to completion of tenant fit-out. And regardless, while Byrd's lack of consideration of certain facts may undermine the credibility of his conclusions, it does not render his testimony inadmissible. *See Curlee*, 2014 WL 11516719, at *6 (expert may testify even without knowledge of every conceivably relevant fact).

Nor is the court persuaded that Byrd's alleged misstatement of the date of repair of

Bus Duct B and incorrect consideration of workaround options are sufficient to exclude his testimony. The record includes conflicting evidence regarding the repair date of Bus Duct B.[23] And Byrd's allegedly inconsistent statements regarding workaround options appear to refer to two separate workaround plans with different purposes. Moreover, Hanover fails to explain why, assuming *arguendo* that such statements are inaccurate, they render such testimony so unreliable as to be inadmissible. *See Daubert*, 509 U.S. at 596 (drawing distinction between admissible evidence and "shaky but admissible evidence").

The court thus declines to exclude Byrd's testimony on the basis that it is unreliable.

## C

The court now turns to Hall Arts's motion to exclude Cois as Hanover's expert witness.

## 1

Hall Arts maintains that Cois's testimony is not relevant because it focuses on the effect of the Weather Event on the dried-in date and substantial completion date for KPMG Plaza,[24] which are not relevant to establishing a delay period under the Policy.

---

[23]Turner's master construction schedule notes that completion of "Bus Duct Repair" occurred on December 17, 2014, while Hall Arts's meeting notes for "Meeting #67" indicate that bus duct B was energized on November 25, 2014.

[24]Cois's testimony analyzes whether the Weather Event delayed the overall KPMG Plaza project, as measured by the deadlines set forth in the Turner construction contract. In his deposition, Cois testified numerous times that he did not evaluate the timeline for KPMG's tenant fit-out and that he had no opinion regarding whether Hall Arts suffered lost rents from KPMG.

"The standard for relevance is a liberal one." *EEOC v. Manville Sales Corp.*, 27 F.3d 1089, 1093 (5th Cir. 1994). The court has concluded that the Weather Event's delay of the construction of the KPMG-leased space and the associated structures and materials qualifies as a delay period under the Policy. To be admissible under *Daubert*, Cois' testimony must be relevant to the alleged delay to the construction of the KPMG-leased space and resulting loss of rental income and incurred soft costs. Cois' report appears to be relevant to the commencement date of the KPMG lease. The report addresses the date that the office building must have been topped out and dried in to allow for the start of tenant fit-out,[25] which appears to potentially impact KPMG's actual occupancy date. And the report posits that the building was turned over on October 21, 2014 to allow KPMG to begin tenant fit-out work. The court thus concludes that Cois' testimony could assist the trier of fact in determining a fact in issue: whether the Weather Event delayed either the delivery date[26] or KPMG's occupancy, leading Hall Arts to incur lost rental income and soft costs.

Accordingly, the court holds that Cois' testimony should not be excluded on relevance grounds.

2

Hall Arts maintains that Cois's opinions are unreliable because they are not based on

---

[25]Cois testified in his deposition: "My opinion is that the turnover for tenant fit out was not delayed as a result of the October 13th event because the date of November 1st, was met."

[26]It is unclear whether the turnover date of October 21, 2014 is synonymous with the "delivery date," as defined by the KPMG lease.

sufficient facts or data and because Cois did not employ a recognized methodology in forming his opinions.

In preparing his report, Cois reviewed construction documents and communications produced during the course of litigation. Cois did not review the Policy and the definition of delay period. But Hall Arts provides no explanation of why such review is necessary to offer a reliable opinion regarding whether the top-out/dry-in date milestone was met and whether tenant build-out commenced as originally scheduled. Regarding his "methodology," Cois's report states:

> To complete the required tasks associated with the assignment, DBI performed a detailed review and analysis of the submitted documentation. Upon completion of the review, DBI cross-referenced the information contained in the various documents to determine consistencies and inconsistencies within the details of the information. DBI based its observations and conclusions on the data and information that was obtained from the various documents.

D. 4/19/18 App. 11. Cois did not employ the widely-accepted critical path method used by Byrd,[27] but he explained that he did not believe the critical path model was appropriate in this case because he did not have the construction schedules for the months of October and November. Moreover, Cois's report is relevant to the case because it identifies certain

_____

[27]Hall Arts relies on *Balfour Beatty Rail, Inc. v. Kansas City Southern Railway Co.*, 173 F.Supp.3d 363 (N.D. Tex. 2016) (Lindsay, J.), for the proposition that an expert opinion is not reliable where the expert "never articulated in any detail . . . the methodology used by analysts in the construction field to determine whether a particular activity or delay in a project was a critical path activity or delay." *Id.* at 414. But *Balfour Beatty* is distinguishable because Cois has adequately explained why he did not use the critical path method and why he followed the method he chose.

inconsistencies and revisions to the various construction documents. *See Burbach Aquatics, Inc. v. City of Elgin, Ill.*, 2011 WL 204800, at \*5 (N.D. Ill. Jan. 18, 2011) (citing *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)) ("The expert need not have an opinion on the ultimate question to be resolved by the trier of fact" to provide testimony that would assist the trier of fact "with its analysis of any of the issues involved in the case."). Aside from noting that Cois did not apply the critical path method, Hall Arts offers no reason why Cois's analysis of the content of the construction documents and correspondence is unreliable.

Because Hall Arts has not shown that Cois' report is unreliable, the court denies Hall Arts's motion to exclude Cois as an expert witness.

\*    \*    \*

For the reasons explained above, the court grants in part and denies in part Hanover's motion for summary judgment, denies Hall Arts's cross-motion for summary judgment, and denies Hanover's and Hall Arts's motions to exclude expert testimony.

**SO ORDERED**.

August 6, 2018.


_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE